In the

# United States Court of Appeals
# for the Fourth Circuit

**Daniel P. Mook**,

*Plaintiff-Appellee,*

v.

**G. Andrew Hall**,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Virginia
No. 4:23-cv-00028, Thomas T. Cullen, *District Judge*

### Brief of Plaintiff-Appellee

WILLIAM & MARY LAW SCHOOL
Appellate & Supreme Court Clinic
PO Box 8795
Williamsburg, VA 23187


Student Counsel:
   Jonathan Gharib
   Jack Kerdasha
   Raahim Zaidi


November 13, 2025

Bryan Lammon
FINAL DECISIONS PLLC
8401 Maryland Drive Suite 8197
Richmond, VA 23294
757-204-5896
bryan@finaldecisions.org

Scott G. Crowley Sr.
CROWLEY & CROWLEY
4870 Sadler Road, Suite 300
Glen Allen, VA 23060
804-205-5010

*Attorneys for Plaintiff-Appellee
Daniel Mook.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1677</u>       Caption: <u>Daniel P. Mook v. G. Andrew Hall</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Daniel P. Mook</u>
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                              ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                                 ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Bryan Lammon                        Date: November 13, 2025

Counsel for: Daniel P. Mook

Print to PDF for Filing

# Table of Contents

Table of Authorities ........................................................... iii

Jurisdictional Statement ...................................................... 1

Statement of the Issues ....................................................... 2

Introduction ...................................................................... 3

Statement of the Case .......................................................... 5

    A. Factual Background ..................................................... 6

    B. Procedural Background ................................................ 9

Summary of the Argument ................................................... 11

Argument ......................................................................... 14

    A. Because qualified immunity is not a defense to FMLA
    interference claims, this Court lacks jurisdiction over Hall's
    appeal .......................................................................... 14

        1. FMLA interference claims have no analogous common-law
        tort with a history of official immunity ........................... 17

        2. Policy reasons do not support reading a qualified immunity
        defense into the FMLA. .............................................. 24

            a. The FMLA's express application to public officials,
            inclusion of a good-faith defense, and silence on qualified
            immunity show that Congress did not intend to include an
            immunity defense. .................................................. 25

            b. Reading qualified immunity into the FMLA would
            undermine Congress's purpose in protecting unpaid medical
            leave. ................................................................ 28

        3. Out-of-circuit decisions applying a qualified-immunity defense
        to FMLA claims contain no analysis or explanation for doing
        so and are therefore unpersuasive. ................................. 31

    B. Hall violated clearly established law in not giving Mook seven
    days to cure any authentication deficiencies in Mook's
    certification. ................................................................. 34

        1. The FMLA's regulations can clearly establish the law. ..................... 35

2. The FMLA's regulations clearly establish a right to a seven-day curing period for potential authentication issues. ..................... 37

    a. Section 825.307(a)'s plain text requires a seven-day cure period for any authentication issues. ........................... 39

    b. When revising § 825.307(a), the Department of Labor expressly acknowledged that § 825.307(a) incorporates the cure procedure found in § 825.305(c). ........................... 44

    c. The regulatory context and purpose confirm that § 825.307(a) requires a seven-day cure period for any authentication issues. .................................................. 48

Conclusion ......................................................... 49

Request For Oral Argument ........................................ 50

Certificate of Compliance ......................................... 52

Certificate of Service ............................................. 53

# Table of Authorities

**Cases**

*Adkins v. CSX Transp., Inc.,*
   70 F.4th 785 (4th Cir. 2023) ...................................................... 21, 43–44

*Advoc. Health Care Network v. Stapleton,*
   581 U.S. 468 (2017) ........................................................................ 42

*Anderson v. Creighton,*
   483 U.S. 635 (1987) .................................................................... 17, 24

*Berry v. Funk,*
   146 F.3d 1003 (D.C. Cir. 1998) .............................................. 15, 26–27

*Bryant v. Tex. Dep't of Aging & Disability Serv.,*
   781 F.3d 764 (5th Cir. 2015) ............................................................ 31

*Buchbinder v. Natanzon,*
   205 F. App'x 984 (4th Cir. 2006) ..................................................... 40

*Carbon Fuel Co. v. USX Corp.,*
   100 F.3d 1124 (4th Cir. 1996) ......................................................... 25

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979) ........................................................................ 36

*Cippollone v. Liggett Grp.,*
   505 U.S. 504 (1992) ........................................................................ 25

*Cozad v. Ill. Dep't of Corr.,*
   No. 4:16-cv-04131, 2018 WL 2758261 (C.D. Ill. Apr. 17, 2018) ......... 43

*Crawford–El v. Britton,*
   93 F.3d 813 (D.C. Cir. 1996) ........................................................... 26

*Darby v. Bratch,*
   287 F.3d 673 (8th Cir. 2002) ........................................................... 31

*Decou-Snowton v. Paris,*
   No. 21-cv-10302, 2022 WL 4245492 (E.D. La. Sept. 15, 2022) .......... 43

*Duncan v. Walker,*
   533 U.S. 167 (2001) ........................................................................ 42

*Dupree v. Younger*,
    598 U.S. 729 (2023) ....................................................... 1, 14

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................. 48

*Gilbert v. Residential Funding LLC*,
    678 F.3d 271 (4th Cir. 2012) ............................................. 40

*Hamer v. Neighborhood Hous. Servs. of Chicago*,
    583 U.S. 17 (2017) ............................................................... 14

*Hannah P. v. Haines*,
    80 F.4th 236 (4th Cir. 2023) ............................................. 44

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ...................................................... 24, 35

*Harris v. Norfolk S. Ry. Co.*,
    784 F.3d 954 (4th Cir. 2015) ............................................. 39

*Hayes v. Cape Henlopen Sch. Dist.*,
    341 F. Supp. 823 (D. Del. 1972) ....................................... 23

*Hicks v. Ferreyra*,
    965 F.3d 302 (4th Cir. 2020) ....................................... 14, 34

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ............................................................. 35

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ............................................................. 16

*Johnson v. Jones*,
    515 U.S. 317 (1995) ............................................................... 5

*Kendall v. Stokes*,
    44 U.S. 87 (1845) ................................................................. 23

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ............................................................. 36

*Meyer v. Town of Wake Forest*,
    No. 5:16-cv-00348, 2018 WL 4689447 (E.D.N.C. Sept. 28, 2018) ...... 37

*Milla v. Brown*,
    109 F.4th 222 (4th Cir. 2024) ........................................... 35

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985) ........................................................ 1, 14

*Murphy v. City of Topeka-Shawnee Cnty. Dept. of Lab. Serv.*,
   630 P.2d 186 (Kan. App. 1981) ........................................... 23

*Norfolk S. Ry. Co. v. Kirby*,
   543 U.S. 14 (2004) ............................................................. 40

*Otis v. Watkins*,
   13 U.S. 339 (1815) ............................................................. 23

*Pierson v. Ray*,
   386 U.S. 547 (1967) .................................................... 18, 24

*Ragsdale v. Wolverine World Wide, Inc.*,
   535 U.S. 81 (2002) ............................................................. 44

*Rhodes v. Hartford Fire Ins. Co.*,
   548 Fed. App'x 857 (4th Cir. 2013) .................................... 15

*Rivas-Villegas v. Cortesluna*,
   595 U.S. 1 (2021) ............................................................... 36

*Roberts v. Gestamp W. Va., LLC*,
   45 F.4th 726 (4th Cir. 2022) .............................................. 21

*Robertson v. Bell Helicopter Textron, Inc.*,
   32 F.3d 948 (5th Cir. 1994) ................................................ 29

*Samuel v. Holmes*,
   138 F.3d 173 (5th Cir. 1998) ........................................ 28–29

*Shipton v. Balt. Gas & Elec. Co.*,
   109 F.4th 701 (4th Cir. 2024) ............................................ 21

*Snowden v. CheckPoint Check Cashing*,
   290 F.3d 631 (4th Cir. 2002) .............................................. 15

*Sterling v. Bd. of Tr. of the Univ. of Ark.*,
   42 F.4th 901 (8th Cir. 2022) .............................................. 31

*Stramaski v. Lawley*,
   44 F.4th 318 (5th Cir. 2022) ....................... 15–18, 31–33

*Stramaski v. Lawley,*
   No. 4:20-cv-00156, 2025 WL 673461 (S.D. Tex. Mar. 3,
   2025) ................................................................ 20–21, 23

*Tanzin v. Tanvir,*
   592 U.S. 43 (2020) .............................................. 15

*Thorpe v. Clarke,*
   37 F.4th 926 (4th Cir. 2022) ............................... 35

*Tower v. Glover,*
   467 U.S. 914 (1984) ............................... 15–16, 18–19

*United States ex rel. Citynet, LLC v. Gianato,*
   962 F.3d 154 (4th Cir. 2020) ........................ 15, 28–29

*United States v. Abdelshafi,*
   592 F.3d 602 (4th Cir. 2010) ............................... 48

*United States v. Gonzales,*
   520 U.S. 1 (1997) ............................................... 40

*United States v. Heyward,*
   42 F.4th 460 (4th Cir. 2022) ............................... 32

*Vannoy v. Federal Reserve Bank of Richmond,*
   827 F.3d 296 (4th Cir. 2016) ............................... 44

*Wilkes v. Dinsman,*
   48 U.S. 89 (1849) ............................................... 23

*Winfield v. Bass,*
   106 F.3d 525 (4th Cir. 1997) ................................ 8

*Witt v. W. Va. State Police,*
   633 F.3d 272 (4th Cir. 2011) ................................. 5

*Wyatt v. Cole,*
   504 U.S. 158 (1992) .......................... 16–20, 24–25, 32

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017) .............................. 17, 33–34

**Statutes & Regulations**

18 U.S.C. § 2520 ............................................................ 26

28 U.S.C. § 1291 ......................................................... 1, 4

28 U.S.C. § 2107 ............................................................. 2

29 C.F.R. § 825.220.................................................. 22, 39

29 C.F.R. § 825.305................................................ 2, 37–38

29 C.F.R. § 825.306......................................................... 6

29 C.F.R. § 825.307.............................. 3, 13, 38–39, 43, 47

29 U.S.C. § 203 ............................................................. 27

29 U.S.C. § 2601 ........................................................ 6, 30

29 U.S.C. § 2611 ........................................................... 27

29 U.S.C. § 2615 ...................................................... 20, 27

29 U.S.C. § 2617 ..................................................... 27–28

45 C.F.R. § 164.508........................................................ 47

73 Fed. Reg. 67,934 ................................................. 45–48

**Rules**

*Antonin Scalia & Brian A. Garner, Reading Law* .................................. 42

*Black's Law Dictionary* (12th ed. 2024).................................. 21

*Dobbs' Law of Torts* (2d ed. 2025)............................................ 22

N. Peter Lareau, *Labor and Employment Law* (2025) .......................... 22

*Restatement (Third) of Torts* (2025) ....................................... 22

*Restatement of Employment Law* (2024) .................................... 22

Sabra Craig, *The Family and Medical Leave Act of 1993: A Survey of the Act's History, Purposes, Provisions, and Social Ramifications*,
44 Drake L. Rev. 51 (1995) ................................................ 30

*The New Oxford American Dictionary* (1st ed. 2005) ............................ 41

*Webster's Third New International Dictionary* (1976)............................ 40

## Other Authorities

Fed. R. App. P. 4 ........................................................................... 2

## Jurisdictional Statement

Defendant-Appellant G. Andrew Hall's Jurisdictional Statement is neither complete nor correct. Hall is correct regarding the District Court's subject-matter jurisdiction. But this Court lacks jurisdiction to review the District Court's denial of summary judgment.

Hall claims to appeal from the denial of summary judgment on qualified-immunity grounds, which would be an appealable final decision under the collateral-order doctrine. *See* 28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 524–27 (1985). But Plaintiff-Appellee Daniel P. Mook's claims arise under the Family and Medical Leave Act. And—as explained below, *see infra* at page 14—qualified immunity is not a defense in FMLA actions. So the District Court's decision was a typical denial of summary judgment, which is not immediately appealable. *See Dupree v. Younger*, 598 U.S. 729, 736 (2023).

If this Court concludes otherwise—that qualified immunity is a defense to FMLA claims, such that Hall can immediately appeal the District Court's decision—his appeal was timely. The District Court denied summary judgment on June 5, 2025. JA153. Hall filed his notice of appeal 7 days later, on June 12, 2025. JA169. That notice was timely.

*See* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

## Statement of the Issues

1. For this Court to have jurisdiction over Hall's appeal, qualified immunity must be a defense to Mook's claims. But qualified immunity is not a defense in every action against government officials. And when Congress creates a statutory remedy, courts cannot read into the statute an atextual immunity defense without both a history of official immunity for an analogous common-law tort and strong policy reasons supporting the addition of the defense. The FMLA created a comprehensive remedial scheme—including a right to sue individual government officials—with its own good-faith defense. And no analogous common-law tort has a history of qualified immunity. Should this Court add a qualified immunity defense to the FMLA?

2. Employers can require that employees taking FMLA leave fill out a certification form. The FMLA's regulations define several potential deficiencies in those certifications. Those regulations also say that an employer cannot contact a health-care provider without first "giv[ing] the employee an opportunity to cure any deficiencies as set forth in [29 C.F.R.] § 825.305(c)." And § 825.305(c) sets out a procedure requiring

notice to the employee and seven days to cure deficiencies. Do the FMLA's regulations clearly establish an employee's right to a seven-day cure period for any deficiencies in FMLA certifications?

## Introduction

The FMLA prohibits employers from interfering with employees' exercise of their FMLA rights. Among the prohibited acts is a general bar on employers' contacting their employees' (or their employees' families') health-care providers. So when an employer identifies a potential defect with an employee's request for FMLA leave, the FMLA's regulations require that the employer give the employee a chance to cure "any deficiencies" before contacting the employee's (or the employee's family member's) doctor. 29 C.F.R. § 825.307(a). That way employees themselves can fix any issues without direct contact between an employer and health-care provider.

In this case, Defendant-Appellant G. Andrew Hall concedes that he (through his assistant) contacted a health-care provider without first providing Plaintiff-Appellee Daniel P. Mook an opportunity to cure any deficiencies in Mook's request for FMLA leave. The deficiency, according to Hall, was that Mook had filled out all of an FMLA-leave form

himself—including a portion that a doctor was supposed to complete (Mook did so using the information from a prior leave he had taken)— and a nurse had sign the form on behalf of a doctor. Hall claims he thought Mook's apparent efforts at efficiency were instead an attempt at fraud. Hall fired Mook before Mook could take his FMLA leave, and Mook sued Hall for interfering with Mook's FMLA rights.

The District Court denied Hall's motion for summary judgment. Hall has now appealed. But his appeal faces two insurmountable problems.

*First*, Hall cannot appeal from the denial of summary judgment. Summary-judgment denials are normally not appealable "final decisions" under 28 U.S.C. § 1291. Hall's only proffered ground for this immediate appeal is that the District Court denied Hall's request for qualified immunity. But qualified immunity is not a defense in FMLA actions. So there is no jurisdictional basis for Hall's interlocutory appeal.

*Second*, even if qualified immunity is a possible defense, it would not apply in this case. To defeat a qualified-immunity defense, Mook must show that Hall's contact with the doctor's office and subsequent

termination of Mook violated Mook's clearly established rights under the FMLA. And by their plain text—and confirmed by their history, context, and purpose—the FMLA's regulations prohibit an employer from contacting a health-care provider without first giving employees the opportunity to cure any deficiencies in a request for FMLA leave. These regulations clearly establish the illegality of Hall's conduct. The District Court was thus correct in denying summary judgment.

This Court should accordingly dismiss this appeal for a lack of jurisdiction. Alternatively, if this Court concludes that appellate jurisdiction exists, it should affirm the denial of qualified immunity.

## Statement of the Case

As explained below, this Court lacks jurisdiction over this purported appeal from the denial of qualified immunity. But to the extent the appeal is proper, the scope of appeal is limited. In immediate appeals from the denial of qualified immunity, this Court must take as given the District Court's assessment of the facts a reasonable jury could find and address only abstract legal issues. *See Johnson v. Jones*, 515 U.S. 304, 317 (1995); *Witt v. W. Va. State Police*, 633 F.3d 272, 276 (4th Cir. 2011). Mook thus presents the facts that—according to the District

Court—a reasonable jury could find, acknowledging of course that several of these facts are genuinely disputed.

## A. Factual Background

Mook worked as an Assistant Commonwealth's Attorney in Martinsville, VA, from 2018 until his termination in 2021. JA153. During his employment, Mook's mother (who lives in Wisconsin) developed severe osteoporosis. JA154; JA29. In 2020, Mook took leave under the FMLA to care for his mother. JA154. (The FMLA generally requires employers to provide employees with up to twelve weeks of unpaid leave for medical or family reasons. *See* 29 U.S.C. §§ 2601 et al.) In 2021, Mook again needed FMLA leave to care for his mother. JA154. So, just like his 2020 leave, Mook had to complete a certification form. JA154.

An FMLA certification form contains the information employers may require from employees before granting FMLA leave. 29 C.F.R. § 825.306(a). An employer may use any form to gather that information, though the Department of Labor has provided forms for employers to use, and Mook used one of those forms. 29 C.F.R. § 825.306(b); JA87–90. The form ensures that there is a verified family or medical condition

that necessitates the leave.

In an apparent effort to speed along the certification process, Mook filled out nearly all four pages of the certification form—including the portion of the form that a medical professional was to complete. JA154. To do so, Mook relied on the information from his 2020 request for FMLA leave and his knowledge of his mother's condition. JA154. Mook then accompanied his mother to a medical appointment, where Mook presented the form to a nurse. JA155.

The parties dispute what happened next. JA155. But Mook presented evidence that he (1) told the nurse that he needed an FMLA form completed for his employer, (2) gave all four pages of the form to the nurse, (3) explained that he had filled out the entire form, and (4) told the nurse that "if any changes needed to be made" that the nurse "should go ahead and do that." JA155. The nurse took the form, left the room, returned a few minutes later, and asked where to sign. JA155. The nurse then signed the last page of the form on behalf of the doctor. JA155. At some point, the nurse also wrote in the office's address on the second page of the form. JA88.

To be sure, the nurse tells a different story, claiming to think that

the document he signed (which is reproduced at JA87–90) was an excuse for missing work that day. JA155–56. But that means only that the parties genuinely dispute what happened. And to the extent this appeal from the denial of summary judgment on qualified-immunity grounds is proper, this Court must take the District Court's assessment of the evidence as given and view any factual disputes in the light most favorable to Mook. *See Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc).

Mook then faxed the completed certification form to Hall and the Martinsville Human Resources Department. JA156. Upon seeing that nearly all of the form was filled out in Mook's handwriting, Hall's assistant contacted the doctor's office to determine whether the nurse had actually signed the form. JA156. The nurse apparently claimed to have not known that he was signing an FMLA leave request. JA156. The nurse did, however, confirm that he had signed it. JA156.

When Hall learned of this, he asked Mook if he had filled out the form himself and whether he intentionally tried to deceive the nurse. JA156. Mook immediately acknowledged that he had filled out the form himself, vehemently denied any intent to deceive, and—unprompted—

offered to obtain another form with the relevant portions filled out by a medical professional. JA156–57. Mook also explained that he had told the nurse to make any needed changes. JA156–57.

Hall nevertheless claimed that this incident showed poor judgment on Mook's part, and Hall questioned Mook's honesty. JA157. Hall also said he would have to terminate Mook, though he offered Mook the chance to resign. JA157. Mook refused, and Hall fired him. JA157.

## B.  Procedural Background

As relevant to the present appeal, Mook sued both Hall and the City of Martinsville for interfering with his FMLA rights. JA8. Mook contended that both defendants interfered with Mook's FMLA rights by (1) contacting a health-care provider without first giving Mook an opportunity to cure any defects in his certification form and then (2) terminating him. JA13. Both defendants eventually moved for summary judgment.

The District Court granted summary judgment to Martinsville, concluding that Virginia law made Hall—not the city—Mook's employer. Order, Doc. No. 70 at 7.

But the District Court denied Hall's motion for summary judgment.

JA167. Hall conceded that he contacted a health-care provider without first providing an opportunity to cure the certification form. JA30–31. But Hall argued that this contact did not violate the FMLA's regulations. JA39–43. Hall alternatively sought qualified immunity, arguing that the regulations were not sufficiently clear. JA52–53.

The District Court disagreed on both points. JA160–67. The District Court held that the FMLA's regulations clearly established Mook's right to an opportunity to cure his certification. JA162–63. (The District Court had reached the same conclusion in an earlier decision denying a motion to dismiss, *see* Doc. No. 24 at 9–11; the District Court adhered to that interpretation of the regulations in denying summary judgment, JA162–63.) The District Court also identified a genuine factual dispute on Hall's argument that he would have terminated Mook, regardless of any FMLA interference, because Hall claimed to be concerned about fraud. JA163–64. The District Court explained that the evidence did "not establish [Mook's] intent to deceive beyond dispute—far from it." JA164. That is, a jury could reject "Hall's accusation that Mook is a dishonest actor who could not be trusted despite years of unblemished service as a lawyer because he improperly filled out a form (and readily

admitted to doing just that when asked)." JA161 n.4. So a jury would need to resolve "whether Mook's purported dishonesty *truly* was the reason for the plaintiff's termination." JA165 (quotation marks omitted).

Hall filed a notice of appeal seven days after the District Court's decision. JA169.

## Summary of the Argument

This court lacks jurisdiction over this appeal. For Hall to appeal from the denial of qualified immunity, qualified immunity must be a defense in an FMLA action. It is not. The statute says nothing about qualified immunity. And courts will not read an atextual immunity defense into a statute unless two requirements are satisfied. First, the statute's remedies must have an analogous common-law tort with a strong history of immunity. Second, even if such a history exists, there must also be strong policy reasons for adding qualified immunity to a statutory remedial scheme.

Here, neither requirement is met. Mook has brought an FMLA interference claim. There is no analogous common-law tort with a history of official immunity—particularly the modern, judicially created

form of qualified immunity that Hall seeks, which (as the Supreme Court has acknowledged) has no basis in the common law. And the FMLA provides both a remedy—one that expressly applies to individual government officials—and a good-faith defense. Nowhere does the FMLA mention qualified immunity. So Congress did not intend for that defense to apply. Adding a qualified-immunity defense would also undermine the balance that Congress struck when giving employees— both public and private—a right to unpaid family and medical leave.

So this Court should not read qualified immunity into the FMLA. And without a qualified-immunity defense, there is no basis for Hall's appeal from the denial of summary judgment. This Court should dismiss the appeal.

If this Court disagrees and holds that qualified immunity is a defense in FMLA actions, it should affirm the denial of qualified immunity. The FMLA prohibits employers from interfering with employees' exercise of their FMLA rights. Among the prohibited acts is a general bar on employers' contacting their employees' (or their employees' families') health-care providers. So when an employer identifies a potential issue with an employee's request for FMLA leave,

the FMLA's regulations prohibit employers from contacting the employee's (or the employee's family member's) health-care provider until "after the employer has given the employee an opportunity to cure any deficiencies as set forth in [29 C.F.R.] § 825.305(c)." 29 C.F.R. § 825.307(a).

This provision requires an opportunity to cure "any deficiencies." And the language "as set forth in § 825.305(c)" incorporates the procedures for curing deficiencies in that subsection. Those procedures include giving employees notice of the deficiency and a seven-day period in which to cure deficiencies. So by its plain text, § 825.307(a) prohibits contact with a health-care provider until after the employer has given notice and an opportunity to cure "any" kind of deficiency in a leave request. The regulations' history—including an express acknowledgment from the Department of Labor that a cure opportunity is necessary—along with the regulations' context and purpose all confirm this natural reading.

Hall concedes that he did not give Mook an opportunity to cure any deficiencies in Mook's request for leave. And the regulations clearly establish Mook's right to that opportunity. Hall thus violated clearly

established law, and his qualified-immunity defense fails.

## Argument

### A. Because qualified immunity is not a defense to FMLA interference claims, this Court lacks jurisdiction over Hall's appeal.

Hall has appealed from an order denying summary judgment, which normally is not an immediately appealable final decision under 28 U.S.C. § 1291. *Dupree*, 598 U.S. at 736; *Hicks v. Ferreyra*, 965 F.3d 302, 308 (4th Cir. 2020). To be sure, an exception exists for denials of summary judgment on qualified immunity grounds—those are immediately appealable "final decisions" under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 524–27 (1985). But qualified immunity is not a defense to FMLA interference claims. Given the unavailability of qualified immunity, Hall has no grounds for invoking this Court's appellate jurisdiction. This Court should accordingly dismiss this appeal.[1]

---

[1] The parties did not dispute the availability of a qualified-immunity defense in the District Court. JA166. But the availability of the defense goes to this Court's appellate jurisdiction—if the defense does not apply to FMLA interference claims, there is no basis for this Court to immediately review the denial of summary judgment. So the parties cannot forfeit or waive this point. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 20 (2017) (noting that a "jurisdictional

Courts and litigants sometimes unthinkingly assume that qualified immunity is available any time a plaintiff sues a government official in their individual capacity. *Stramaski v. Lawley*, 44 F.4th 318, 329 (5th Cir. 2022) (Costa, J., concurring). But that is not correct. *See, e.g.*, *United States ex rel. Citynet, LLC v. Gianato*, 962 F.3d 154, 159–60 (4th Cir. 2020) (holding that qualified immunity is not a defense under the False Claims Act); *Berry v. Funk*, 146 F.3d 1003, 1013–14 (D.C. Cir. 1998) (holding that qualified immunity is not a defense under the Electronic Communications Privacy Act of 1986). Although qualified immunity is a defense to many claims brought under 42 U.S.C. § 1983, its application to other statutory remedies is a question of statutory interpretation. *Stramaski*, 44 F.4th at 329 (Costa, J., concurring). And courts will not read a defense into a statute when Congress did not intend for the defense to apply. *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020); *see also Tower v. Glover*, 467 U.S. 914, 922–23 (1984) ("We do

---

defect is not subject to waiver or forfeiture and may be raised at any time in the court of first instance and on direct appeal" (footnote omitted)). And this Court must address it despite the parties' assumptions in the District Court. *See Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 635 (4th Cir. 2002); *Rhodes v. Hartford Fire Ins. Co.*, 548 Fed. App'x 857, 858 (4th Cir. 2013).

not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy."); *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976) (explaining that the Supreme Court's decisions on defenses to § 1983 claims "were not products of judicial fiat" but were instead "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it").

Instead, qualified immunity applies to a statutory remedy only when two conditions are satisfied. First, there must be a history of official immunity for analogous common-law actions at the time Congress enacted the relevant statute. *See Tower*, 467 U.S. at 920. The lack of any historical common-law immunity ends the inquiry. *See Wyatt v. Cole*, 504 U.S. 158, 163–64 (1992); *cf. Tower*, 467 U.S. at 923. Second, even if that history exists, courts must determine whether policy reasons—including an evaluation of the statute's text, history, and purpose—support inserting an atextual immunity defense into the remedial scheme that Congress created. *See Wyatt*, 504 U.S. at 163–64; *see also Tower*, 467 U.S. at 920; *Imbler*, 424 U.S. at 421; *Stramaski*, 44 F.4th at 327.

Congress passed the FMLA in 1993. So for qualified immunity to apply to FMLA interference claims, (1) there must have been an analogous common-law tort with a history of official immunity at that time and (2) policy reasons must support reading immunity into the statute. *See Wyatt*, 604 U.S. at 163–64; *Stramaski*, 44 F.4th at 327.

The FMLA satisfies neither requirement. FMLA interference claims have no common-law analogue with a history of official immunity— particularly the modern form of qualified immunity that Hall seeks, which is based on (in the Supreme Court's words) "principles not at all embodied in the common law." *Anderson v. Creighton*, 483 U.S. 635, 645 (1987); *see also Ziglar v. Abbasi*, 582 U.S. 120, 159–60 (2017) (Thomas, J., concurring in part and concurring in the judgment). And given Congress's creation of a comprehensive remedial scheme—one that expressly applies to government officials and includes its own defense— reading an atextual qualified-immunity defense into the FMLA would be, at the very least, "an extraordinary act of interpretation." *Stramaski*, 44 F.4th at 329 (Costa, J., concurring).

### 1. *FMLA interference claims have no analogous common-law tort with a history of official immunity.*

Before courts can consider reading qualified immunity into a

statute, the statute's remedies must have an analogous common-law tort with a history of official immunity. *Wyatt*, 504 U.S. at 164. The history of immunity must be so well-established that "Congress would have specifically so provided had it wished to abolish the doctrine." *Id.* (quoting *Pierson v. Ray*, 386 U.S. 547, 555 (1967)); *see also Stramaski*, 44 F.4th at 330 n.1 ("[C]ommon-law immunities for analogous claims must have existed when Congress enacted a statute because implicitly recognizing an immunity defense is 'devising limitations to a remedial statute, enacted by the Congress, which on its face does not provide for any immunities.'" (quoting *Wyatt*, 504 U.S. at 171 (Kennedy, J., concurring)).

In determining an analogous tort, courts look to the conduct underlying the statutory remedy and the common-law tort. In *Tower*, for example, the Supreme Court held that public defenders (who allegedly "conspired with various state officials" to deprive plaintiffs of their rights) were not immune from § 1983 liability for intentional misconduct. 467 U.S. at 916. Going as far back as the protections English barristers enjoyed at common law, the Court found no history of immunity for claims involving intentional misconduct. *Id.* at 921–22.

Given the lack of any analogous common-law tort with a history of immunity, the Court declined to create one for public defenders. *Id.* at 922–23. The Court acknowledged the concerns animating the argument for an immunity defense: the lack of such a defense could deter defense counsel's legitimate cooperation with the prosecution (*e.g.*, negotiating pleas) and open the flood gates to frivolous lawsuits. *Id.* at 922. "[B]ut the remedy [the public defenders] urge[d] [was] not for [the Court] to adopt," as courts do "not have a license to establish immunities from § 1983 actions in the interests of what [they] judge to be sound public policy." *Id.* at 922–23. "It is for Congress to determine whether § 1983 litigation has become too burdensome to state or federal institutions and, if so, what remedial action is appropriate." *Id.* at 923.

Similarly, in *Wyatt*, the Supreme Court held that private defendants cannot invoke qualified immunity in § 1983 lawsuits. *Id.* at 169. There, the plaintiff sought damages from private parties who obtained some of the plaintiff's property via a replevin procedure that was later deemed unconstitutional. *Id.* at 159. The Supreme Court analogized the plaintiff's claim to malicious prosecution and abuse of process, as "these torts provided causes of action against private

defendants for unjustified harm arising out of misuse of governmental processes." *Id.* at 164. The Court found no history of qualified immunity for such claims. *Id.*

And in *Stramaski v. Lawley*, the District Court for the Southern District of Texas held that qualified immunity is not a defense to Fair Labor Standards Act retaliation claims. No. 4:20-cv-00156, 2025 WL 673461, at *1 (S.D. Tex. Mar. 3, 2025) (report and recommendation), *adopted* 2025 WL 2071075 (S.D. Tex. July 23, 2025). The district court looked to the conduct that the Act prohibited and concluded that retaliatory discharge was the most analogous tort. *Id.* at *4. But retaliatory discharge did not have a history of official immunity. *Id.*

The relevant conduct here comes from the FMLA's prohibition on interference. The Act states (in relevant part) that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). To prevail on an interference theory, a plaintiff must show "(1) that he is entitled to an FMLA benefit; (2) that his employer interfered with the provision of that benefit; and (3) that the interference caused him harm." *Adkins v. CSX Transp., Inc.*, 70 F.4th

785, 796 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 825 (2024). "An employer may avoid liability if it shows it would have taken the contested adverse employment action regardless of the employee's FMLA leave." *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 732–33 (4th Cir. 2022). And "FMLA interference is prescriptive," meaning that "employer intent is not relevant." *Shipton v. Balt. Gas & Elec. Co.*, 109 F.4th 701, 707 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 774 (2024).

FMLA interference claims have no highly analogous common law tort. Perhaps the closest—but still not close—is retaliatory discharge. To prevail on an employment-retaliation theory, an employee must show "[a]n adverse employment action taken because an employee has engaged in a legally protected activity." *See* Retaliation, *Black's Law Dictionary* (12th ed. 2024). So "the conduct at issue in every retaliation statute . . . is the intent to defy the statute's purpose." *Stramaski*, 2025 WL 673461 at *4 (emphasis omitted). But an employer's intent is irrelevant to FMLA interference claims. *Shipton*, 109 F.4th at 707. So retaliatory discharge does not provide a close common-law analogue.

Tortious interference with contract also does not work. That tort involves interference with an employee's contractual rights. *See*

*Restatement (Third) of Torts* § 16 (2025). But an employer cannot interfere with its own contract. *See* 10 N. Peter Lareau, *Labor and Employment Law* § 259.05 (2025) ("The main impediment to such claims is that the company, being in an at will relationship with the employee, cannot as a matter of law be deemed to have interfered with its own contract."). So there can be no history of public employees' suing public employers for tortious interference with their own employment relationship, much less one that has a strong history of immunity.

Wrongful discharge is also not analogous. Wrongful discharge, as the name implies, normally requires that the employer terminated the employee. *See Restatement of Employment Law* § 5.01 (2024) (noting that few courts have addressed whether adverse actions short of termination give rise to tort liability); *see also Dobbs' Law of Torts* § 703 (2d ed. 2025). FMLA interference, in contrast, covers a wide variety of conduct. *See, e.g.*, 29 C.F.R. § 825.220(c) (explaining that the prohibition on interference bars employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions"). A wrongful discharge claim thus normally requires an employee's termination, while FMLA interference does not.

And wrongful discharge is outcome-focused, not conduct-focused. *See Stramaski*, 2025 WL 673461 at *4.

Even if these torts were analogous, none carries a history of official immunity. Given the inapplicability of tortious interference to employer-employee disputes, this is unsurprising. As for retaliatory discharge and wrongful discharge, Mook's counsel could not identify any evidence of an official immunity for conduct analogous to FMLA interference. Indeed, courts have held that the "the employment decisions of public employers are not immune from judicial scrutiny nor permitted to be motivated by any reason whatsoever." *Hayes v. Cape Henlopen Sch. Dist.*, 341 F. Supp. 823, 836 (D. Del. 1972). The Supreme Court has repeatedly held that immunity does not protect a public official's discretionary actions that are malicious, corrupt, cruel, or outside the scope of their authority. *Wilkes v. Dinsman*, 48 U.S. 89, 130 (1849); *Kendall v. Stokes*, 44 U.S. 87, 87 n.2 (1845); *Otis v. Watkins*, 13 U.S. 339, 344–45 (1815). And in *Murphy v. City of Topeka-Shawnee County Department of Labor Services*, the Court of Appeals of Kansas denied an immunity defense because retaliation constitutes an abuse of authority. 630 P.2d 186, 191 (Kan. App. 1981).

Finally, even if these torts were analogous *and* had a history of official immunity, there is no evidence of a common-law immunity akin to the type of immunity that Hall seeks: modern-day qualified immunity in § 1983 actions. When the Supreme Court first held that § 1983's silence on defenses did not abrogate common-law defenses, it applied those defenses as they were understood at common law: "a protection from liability" for officers who acted "in good faith." *Wyatt*, 504 U.S. at 165; *see Pierson*, 386 U.S. at 556–57. The Supreme Court later "completely reformulated qualified immunity along principles not at all embodied in the common law." *Anderson*, 483 U.S. at 645 (discussing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). Rather than look to an official's subjective good faith, modern qualified immunity asks if the law is clearly established. *See Harlow*, 457 U.S. at 818. So even if FMLA interference had an analogous common-law tort, and even if that common-law tort came with some sort of immunity defense for public officials, there is no historical basis for reading a modern qualified-immunity defense into the FMLA.

**2. *Policy reasons do not support reading a qualified immunity defense into the FMLA.***

Even if a common-law analogue to FMLA interference came with a

well-established history of qualified immunity in its modern form, that history warrants adding an atextual defense to a statute only when doing so is supported by strong reasons. *Wyatt*, 504 U.S. at 164. And there are at least two reasons not to read qualified immunity into the FMLA. *First*, the FMLA's text—creating a remedy against public officials and providing for a good-faith defense while saying nothing about immunity—shows that Congress did not intend to incorporate an immunity defense. *Second*, the judicial addition of immunity to the FMLA would undermine the balance of employer and employee interests that Congress struck in the statute.

    a.   *The FMLA's express application to public officials, inclusion of a good-faith defense, and silence on qualified immunity show that Congress did not intend to include an immunity defense.*

First is the statute's text. "Under the most basic canon of statutory construction, [courts] begin interpreting a statute by examining the literal and plain language of the statute." *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1133 (4th Cir. 1996). Similarly foundational is the canon that the expression of one thing implies the exclusion of others. *Cippollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992).

So when a statute creates a remedy against public officials, includes

specific defenses, and says nothing about qualified immunity, the statute's text shows that Congress did not intend to incorporate any common-law immunities. The D.C. Circuit recognized as much in *Berry*, holding that qualified immunity was not a defense to claims under the Electronic Communications Privacy Act of 1986. 146 F.3d at 1013–14. The court noted that reading defenses into § 1983 was appropriate, as § 1983's remedy was "largely 'devised by the Supreme Court without any legislative or constitutional (in the sense of positive law) guidance.'" *Id.* at 1013 (quoting *Crawford–El v. Britton*, 93 F.3d 813, 832 (en banc) (Silberman, J., concurring) (D.C. Cir. 1996), *vacated on other grounds*, 523 U.S. 574 (1998)). But other statutory remedies like that in the Electronic Communications Privacy Act are different. The Act "itself provide[d] a complete defense for '[a] good faith reliance on . . . a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization." *Id.* (quoting 18 U.S.C. § 2520(d)). And "[w]hen Congress itself provides for a defense to its own cause of action, it is hardly open to the federal court to graft common law defenses on top of those Congress creates." *Id.* The D.C. Circuit added that "[t]his [was] particularly so when Congress provides for a good faith defense

that is more limited than the qualified immunity good faith doctrine the judiciary has devised; Congress, it might be said, has 'occupied the field.'" *Id.*

Applying these canons to the FMLA shows that Congress did not intend to incorporate any immunities. The FMLA's plain text (1) creates a remedy against public officials, (2) includes a good-faith defense, and (3) says nothing about qualified immunity. Congress thus knew it had imposed potential liability on public officials. And Congress's expression of one defense excludes any others, including qualified immunity.

Starting with the remedy, the FMLA makes it unlawful for any employer to interfere with an employee's rights under the Act. 29 U.S.C. § 2615(a)(1). Employees may sue any "employer" that violates the Act. *Id.* § 2617(a). The Act defines "employer" to include "any public agency." *Id.* § 2611(4)(A) (quotation marks omitted); *see also id.* § 203(x) (defining a "public agency" to include "the government of a State or political subdivision thereof" and any agency of "a State[ ] or a political subdivision of a State"). Congress also defined "employer" to include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." *Id.* § 2611(4)(A).

Congress thus knew that it was exposing public officials to potential FMLA liability.

To mitigate that liability (for both public and private employers), Congress created a good-faith defense to FMLA claims. Courts can reduce the damages when an employer shows that its conduct—though violating the FMLA—"was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of" the FMLA. *Id.* § 2617(a)(1)(A)(iii).

Congress thus created a right to sue public officials tempered by a good-faith defense. But neither the statute nor its implementing regulations hint at a defense similar to modern qualified immunity. The inclusion of the good-faith defense, coupled with silence about qualified immunity, shows that Congress intended to exclude any common-law defenses or immunities. That alone is reason enough to hold that qualified immunity is not a defense to FMLA claims.

b. *Reading qualified immunity into the FMLA would undermine Congress's purpose in protecting unpaid medical leave.*

But there is more. Courts will not read qualified immunity into a statue when it would undermine the statute's purpose. *Gianato*, 962 F.3d at 159–60; *Samuel v. Holmes*, 138 F.3d 173, 178 (5th Cir. 1998). In

*Gianato*, for example, this Court explained that reading a qualified-immunity defense into the False Claims Act would undermine that Act's purpose. 962 F.3d at 159–60. This Court recognized that "it surely does not serve the public interest to extend immunity protection to public officials who defraud the government." *Id.* at 160. The Fifth Circuit reached the same conclusion in *Samuel*. 138 F.3d at 178. The Fifth Circuit explained that the False Claims Act exists to "to discourage fraud against the government" and to "encourage those with knowledge of fraud to come forward." *Id.* (quoting *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)). Adding an atextual qualified-immunity defense "would hardly spur reluctant employees to come forward." *Id.*

Just as inserting qualified immunity into the False Claims Act would undermine that Act's purpose, inserting qualified immunity into the FMLA would undermine its purpose: creating a uniform right to unpaid medical leave for employees, both public and private. Before Congress passed the FMLA in 1993, employees' right to unpaid medical leave varied by state, and it did not exist in several parts of the country. Sabra Craig, *The Family and Medical Leave Act of 1993: A Survey of the*

*Act's History, Purposes, Provisions, and Social Ramifications*, 44 Drake L. Rev. 51, 53–54 (1995). For example, California required leave for pregnant employees and guaranteed reinstatement. *Id.* Georgia, in contrast, provided no right to unpaid leave for private employees. *Id.* at 54–55.

The FMLA created a national, uniform policy for unpaid medical leave. *Id.* at 57–58. Through the Act, Congress sought "to entitle employees to take reasonable leave for medical reasons . . . and for the care of a . . . parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). That right exists regardless of whether an employer is a private firm or a public agency.

Reading a qualified-immunity defense into the FMLA would undermine this national, uniform protection by reducing the rights of public employees. Damages actions deter employers from violating the FMLA. Qualified immunity would reduce that deterrence. So reading qualified immunity into the FMLA would upset the balance of interests that Congress struck in passing the FMLA. Indeed, adding qualified immunity would especially upset that balance given that Congress included a good-faith defense, which Congress presumably thought was

sufficient to protect the interests of employers—both public and private.

### 3. Out-of-circuit decisions applying a qualified-immunity defense to FMLA claims contain no analysis or explanation for doing so and are therefore unpersuasive.

Both the Fifth and Eighth Circuits have said or assumed that qualified immunity is a defense to FMLA claims. *See Sterling v. Bd. of Tr. of the Univ. of Ark.*, 42 F.4th 901, 905 (8th Cir. 2022); *Bryant v. Tex. Dep't of Aging & Disability Serv.*, 781 F.3d 764, 769–71 (5th Cir. 2015). But neither case is persuasive, as neither contains any analysis of the issue. *Sterling* addressed only whether the rights at issue were clearly established and distinguished a prior Eighth Circuit case—*Darby v. Bratch*, 287 F.3d 673 (8th Cir. 2002)—as holding only that the rights at issue in *Darby* were clearly established. 42 F.4th at 905. *Bryant* similarly addressed only whether a right was clearly established. 781 F.3d at 769–71.

Neither *Sterling* nor *Bryant* contains analysis of whether qualified immunity is a defense under the FMLA. The decisions instead reflect the extent to which "qualified immunity dominates section 1983 litigation," with "everyone . . . assum[ing] the immunity exists whenever a public official is sued." *Stramaski*, 44 F.4th at 329 (Costa,

J., concurring). That is, both decisions "wrongly assume that immunity is the default and exists unless Congress states otherwise." *Id.* at 330. (Indeed, Judge Costa of the Fifth Circuit has said that *Bryant* itself suffers from this defect. *Id.*) So neither case's insertion of "an atextual immunity defense" engaged with the Supreme Court's cases on whether the defense is available. *Id.* Neither involved "a statute-specific analysis to determine if common-law immunity from suit was 'firmly rooted' as a protection against a closely analogous tort." *Id.* at 331 (quoting *Wyatt*, 504 U.S. at 164–65). Neither asked if a common-law immunity "was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.'" *Id.* at 329–30 (quoting *Wyatt*, 504 U.S. at 163–64). Neither explains why modern qualified immunity—which has no basis in the common law— can be read into the FMLA. And neither explains how courts can add defenses to a statute that by its plain terms creates a remedy against public officials, includes its own good-faith defense, and says nothing about immunity.

Courts are understandably reluctant to create circuit splits. *See United States v. Heyward*, 42 F.4th 460, 482 (4th Cir. 2022) (Agee, J.,

dissenting). But this Court should not blindly follow other circuits down a mistaken path just because those circuits went first. This is especially true when those other circuits gave no explanation—much less a persuasive explanation—for their decisions.

* * *

FMLA interference claims have no closely analogous common law tort with a history of official immunity, much less a history of modern qualified immunity. And Congress created a comprehensive remedial scheme in the FMLA, which expressly applies to public officials like Hall and specifies the applicable defenses. So "recognizing an immunity defense" in this case "when the words of the statute do not provide one" would not merely be "an extraordinary act of interpretation." *Stramaski*, 44 F.4th at 329 (Costa, J., concurring); *see also Ziglar*, 582 U.S. at 159 (Thomas, J., concurring in part and concurring in the judgment) ("Because our analysis is no longer grounded in the common-law backdrop against which Congress enacted [the statute from which § 1983 comes], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." (quotation marks omitted)). It would "instead represent precisely the sort of freewheeling policy choice[s]

that [courts] have previously disclaimed the power to make." *Ziglar*, 582

U.S. at 159–60 (Thomas, J., concurring in part and concurring in the

judgment).

Given that qualified immunity is not a defense to Mook's FMLA

claim, this Court lacks jurisdiction over Hall's appeal. Again, denials of

summary judgment are normally not immediately appealable. *Hicks*,

965 F.3d at 308. And no statute, rule, or judicial decision permits an

immediate appeal from the summary-judgment denial here. This Court

should dismiss the appeal.

## B. Hall violated clearly established law in not giving Mook seven days to cure any authentication deficiencies in Mook's certification.

If this Court concludes that qualified immunity is available in

FMLA actions, this Court has jurisdiction over Hall's appeal. This Court

should nevertheless affirm the denial of qualified immunity. By their

plain text, the FMLA's regulations require that employers give

employees seven days to cure any deficiencies in a leave certification.

Hall concedes that he did not give Mook this opportunity to cure the

authentication deficiency in Hall's certification. And the regulations

clearly establish the law. So even if Hall could raise a qualified-

immunity defense, he loses on the merits.

### 1. The FMLA's regulations can clearly establish the law.

Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To prevail on a qualified-immunity defense, a defendant "must show that either (1) they did not violate a constitutional [or statutory] right, or (2) that the right was not clearly established when the challenged conduct occurred." *Milla v. Brown*, 109 F.4th 222, 223 (4th Cir. 2024) (numbering added). "[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks omitted). So the inquiry is whether government officials have fair notice that their conduct is unlawful. *See Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022) ("Qualified immunity fundamentally concerns itself with fair notice." (quotation marks omitted)).

An on-point case is not always necessary to clearly establish the

law. To be sure, courts often require analogous cases to clearly establish the law in § 1983 actions. *See, e.g.*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021). That is because the constitutional provisions normally at issue in those cases can be too general to provide fair notice of the illegality of particular conduct. Caselaw can be necessary to provide that notice.

The same is not true for statutory or regulatory violations. When a statute or regulation squarely governs—and prohibits—a defendant's conduct, the statute or regulation provides the fair notice that qualified immunity requires.

Hall does not seem to dispute this point. He conceded in the District Court that the "FMLA['s] statutory protections are clearly established." JA52. And he does not argue that regulations cannot clearly establish the law. (For good reason—regulations enacted under a valid statutory delegation have the force and effect of law. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395–96 (2024).) Hall focuses instead on whether the regulations at issue in this case clearly prohibited his conduct.

Hall does, however, suggest that the lack of analogous caselaw is

enough to grant qualified immunity. Op. Br. at 17–18. As just explained, that is incorrect. And the case on which Hall relies—the Eastern District of North Carolina's decision in *Meyer v. Town of Wake Forest*, No. 5:16-cv-00348, 2018 WL 4689447 (E.D.N.C. Sept. 28, 2018), *see* Op. Br. at 17 n.4—is not to the contrary. *Meyer* held only that the right at issue in *Meyer* (a claimed right to take FMLA leave to attend a state fair) was not clearly established by the FMLA, its regulations, or caselaw. *Id.* at *15.

In short, so long as the FMLA or its regulations clearly prohibited Hall's conduct, the violation here is clearly established.

### 2. The FMLA's regulations clearly establish a right to a seven-day curing period for potential authentication issues.

Employers can require that requests for FMLA leave "be supported by a certification issued by the health care provider of the employee or the employee's family member." 29 C.F.R. § 825.305(a). The FMLA's regulations set forth different kinds of problems—"deficiencies" in the language of the regulations—that these certifications might have.

The regulations specify four kinds of deficiencies. The first two come from § 825.305(c). A certification can have a "completeness" issue,

meaning that "the employer receive[d] a certification, but one or more of the applicable entries have not been completed." *Id.* § 825.305(c). A certification can also have a "sufficiency" issue, meaning that "the employer receive[d] a complete certification, but the information provided is vague, ambiguous, or non-responsive." *Id.* The third and fourth kinds of deficiencies come from § 825.307(a). A certification can have an "authentication" issue, meaning that a question exists as to whether "the information contained on the certification form was completed and/or authorized by the health care provider who signed the document." *Id.* § 825.307(a). And a certification can have a "clarification" issue, meaning that an employer cannot "understand the handwriting on the medical certification or . . . understand the meaning of a response." *Id.*

These regulations also specify what to do with deficiencies. Section 825.305(c)—which, again, defines completeness and sufficiency deficiencies—says that an employer "must provide the employee with seven calendar days . . . to cure any such deficiency." *Id.* § 825.305(c). Section 825.307(a)—again, the regulation on authentication and clarification deficiencies—says that an employer cannot contact a

medical provider about an authentication or clarification issue until "after the employer has given the employee an opportunity to cure any deficiencies as set forth in § 825.305(c)." *Id.* § 825.307(a).

The only potential deficiency at issue in this case is authentication. And by its plain text—and reinforced by its history, context, and purpose—this just-quoted portion of § 825.307(a) requires that employers give employees seven days to cure any authentication issues before the employer can contact a medical provider. Hall acknowledges that he did not give Mook seven days to cure any authentication issues before contacting the doctor's office. That violated the § 825.307(a) and thus interfered with Mook's FMLA rights. *See id.* § 825.220(b) ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act."). And given § 825.307(a)'s plain text, Hall's violation of the regulation was clear.

> a. *Section 825.307(a)'s plain text requires a seven-day cure period for any authentication issues.*

Courts interpret regulations just like they interpret statutes. *Harris v. Norfolk S. Ry. Co.*, 784 F.3d 954, 962 (4th Cir. 2015). The starting point for any interpretation is the text. *Gilbert v. Residential Funding*

*LLC*, 678 F.3d 271, 276 (4th Cir. 2012). And if a regulation "has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." *Id.* (quotation marks omitted).

Section 825.307(a) says (in pertinent part) that an "employer may contact the health care provider for purposes of clarification and authentication of the medical certification . . . after the employer has given the employee an opportunity to cure any deficiencies as set forth in § 825.305(c)." This provision includes two key terms: "any" and "as set forth."

"Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Webster's Third New International Dictionary* 97 (1976)); *see also Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31 (2004). So "'[a]ny' means any, i.e., every." *Buchbinder v. Natanzon*, 205 F. App'x 984, 991 (4th Cir. 2006) (Niemeyer, J., dissenting). Section 825.307(a) thus refers to curing every kind of deficiency, including authentication deficiencies.

"As set forth" also has a specific meaning. In this context, "as" is a conjunction "used to indicate by comparison the way that something

happens or is done." *The New Oxford American Dictionary* 89 (1st ed. 2005). The phrasal verb "set something forth" "state[s] or describe[s] something in writing or speech." *Id.* at 1550. So § 825.307(a)'s use of the phrase "as set forth" is not merely a reference to § 825.305(c). The phrase instead incorporates the "the way that something happens or is done"—that is, the cure procedure—"state[d] or describe[d]" in § 825.305(c).

Section 825.307(a) thus requires employers to give employees the opportunity to cure all deficiencies—including authentication deficiencies—through the procedures set out in § 825.305(c)—"seven calendar days . . . to cure any such deficiency." So by its plain text, § 825.307(a) required that Hall give Mook seven days to cure any authentication issues before Hall could contact a medical provider.

Hall contends that § 825.307(a) requires that employers give employees an opportunity to cure only the deficiencies listed in § 825.305(c), *i.e.*, completeness and sufficiency deficiencies. Op. Br. at 20. In doing so, he reads the words "any" and "as set forth" out of the regulation and replaces them with his own preferred terms. That is, Hall reads § 825.307(a) as if it said that an employer can contact a

medical provider after giving "the employee an opportunity to cure *the*
deficiencies *listed* in § 825.305(c)." But that is not what the regulation
says. The words the regulation actually uses require § 825.305(c)'s
seven-day opportunity to cure any deficiencies.

Hall's reading of § 825.307(a) would also impermissibly render part
of the regulation meaningless. The "so-called surplusage canon" creates
a presumption that each word in a regulation "is there for a reason."
*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017); *see
also Duncan v. Walker*, 533 U.S. 167, 174 (2001); *Antonin Scalia &
Brian A. Garner, Reading Law* 174 ("The surplusage canon holds that it
is no more the court's function to revise by subtraction than by
addition."). So § 825.307(a)'s mention of § 825.305(c) cannot be read to
merely restate what § 825.305(c) already says. The clause must do
something. The plain and natural reading of § 825.307(a)—requiring an
opportunity to cure authentication deficiencies—gives effect to every
word.

Indeed, courts' quotations of § 825.307(a) confirm that this is the
natural reading of the provision. Courts quoting the regulation—
including this Court—have sometimes omitted the last clause of this

provision ("as set forth in § 825.305(c)"), saying only that an employer may contact a medical provider "after the employer has given the employee an opportunity to cure any deficiencies." *Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 796 (4th Cir. 2023); *see also, e.g.*, *Decou-Snowton v. Paris*, No. 21-cv-10302, 2022 WL 4245492, at *13 (E.D. La. Sept. 15, 2022) (quoting § 825.307(a) to prohibit employers from contacting a medical provider until "after the employer has given the employee an opportunity to cure any deficiencies" (emphasis omitted)); *Cozad v. Ill. Dep't of Corr.*, No. 4:16-cv-04131, 2018 WL 2758261, at *5 (C.D. Ill. Apr. 17, 2018) (describing § 825.307(a) as "authoriz[ing] an employer to contact an employee's health care provider to clarify and authenticate medical certification 'after . . . giv[ing] the employee an opportunity to cure any deficiencies'"). To be sure, these decisions did not ask or answer whether § 825.307(a) requires a cure period for authentication deficiencies. But their quotations of the regulation show its natural reading: requiring a cure opportunity for all deficiencies.

Despite this clear text, Hall suggests that two decisions from this Court—*Adkins v. CSX Transportation, Inc.*, 70 F.4th 785 (4th Cir. 2023), and *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296

(4th Cir. 2016)—support his actions. Not so. Although employers can "investigate and address plausible allegations that employees have been dishonest in their medical leave claims," *Adkins*, 70 F.4th at 797, nothing in *Adkins* or *Vannoy* suggests that employers can do so in ways that violate the FMLA or its regulations.[2]

    b.   *When revising § 825.307(a), the Department of Labor expressly acknowledged that § 825.307(a) incorporates the cure procedure found in § 825.305(c).*

The plain text of § 825.307(a) is enough to deem the law clearly established. That provision's history only confirms the plain reading: when revising § 825.307(a) in 2008, the Department of Labor expressly said that before contacting health-care providers about authentication deficiencies, employers must first provide a cure opportunity "pursuant

---

[2] Hall also appears to suggest that Mook would have been terminated regardless of any FMLA interference. But any concern about why an employer terminated an employee goes to the prejudice requirement of an FMLA interference theory. *See Adkins*, 70 F.4th at 796–97; *Vannoy*, 827 F.3d at 303. An employer is not liable for FMLA interference unless the violation prejudiced the employee. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). And no prejudice exists when an employer "would have made the same employment decision independent of the FMLA interference." *Hannah P. v. Haines*, 80 F.4th 236, 244 (4th Cir. 2023). But prejudice is not at issue in this appeal. And even if it were, a reasonable jury could (as the District Court noted) deem specious Hall's claim that he would have terminated Mook regardless of any FMLA interference. JA165.

to the procedures set forth in § 825.305(c)." 73 Fed. Reg. 67,934, 68,017 (Nov. 17, 2008).

As Hall acknowledges, the Department revised § 825.307(a) in 2008, and the version of § 825.307(a) in effect during Mook's employment is substantially the same as the 2008 revision. Op. Br. at 21. Hall also relies on the Department's statements about those revisions in his argument. Op. Br. at 21–22.

But those statements actually contradict Hall's argument. When discussing the changes to § 825.307(a), the Department said that § 825.307(a) incorporates § 325.305(c)'s *procedures*, thereby requiring an opportunity to cure before an employer can contact a medical provider about an authentication issue:

> Proposed § 825.307(a) required that prior to any contact with the employee's health care provider for purposes of clarification or authentication of the FMLA certification, the employee must first be given an opportunity to cure any deficiencies in the certification pursuant to the procedures set forth in § 825.305(c).

73 Fed. Reg. at 68,017. (Although the Department made some changes to the proposed regulation in response to comments, it did not change this part of § 825.307(a). *See id.* at 68,017–20.) The Department thus incorporated into § 825.307(a) what it elsewhere called "the procedure

for curing a deficient certification set forth in [§ 825.305(c)]." *Id.* at 68,013. So the reference to § 825.305(c) did not merely refer to an opportunity to cure sufficiency and completeness deficiencies. It instead incorporated § 825.305(c)'s cure procedure—notice to the employee and seven days—for all kinds of deficiencies. *See also id.* at 68,020 (noting, in the discussion of § 825.307(a), that "employees may choose to forego the opportunity to utilize the cure procedure in § 825.305(c) if they wish their employer to proceed immediately with curing any deficiencies in the certification through direct contact with their health care provider.").

Hall's reliance on § 825.307(a)'s history is thus mistaken. He appears to have overlooked the Department's statement that § 825.307(a) requires a cure period for authentication issues. And Hall's argument concerning the 2008 removal of the permission requirement from § 825.307(a) misunderstands that change. To be sure, the prior version of § 825.307(a) required that an employer obtain an employee's permission before contacting a medical provider for authentication issues. But that permission requirement was not about an opportunity to cure. It instead existed to protect employee privacy—the Department

did not want employers contacting health-care providers and obtaining employees' private health information without the employee's permission. 73 Fed. Reg. at 68,019.

Dissatisfied with how this permission requirement operated in practice, the Department replaced it with a requirement that employers comply with the Health Insurance Portability and Accountability Act's Privacy Rule, which sets standards for protecting certain health information. *See* 29 C.F.R. § 825.307(a); *see also* 73 Fed. Reg. at 68,017. Rather than relying on employee permission—which can come in a variety of forms, including verbal consent—authorization now comes via a written document that must include certain information. 73 Fed. Reg. at 68,019; *see also* 45 C.F.R. § 164.508(c) (setting out the core requirements for an authorization). This HIPAA authorization thus "supplant[ed] and serve[d] the same purpose as the 'with the employee's permission' standard under the" old version of § 825.307(a). 73 Fed. Reg. at 68,019. So the removal of the permission requirement—and the addition of an authorization requirement—had nothing to do with any cure period.

### c.   The regulatory context and purpose confirm that § 825.307(a) requires a seven-day cure period for any authentication issues.

Section 825.307(a)'s context and purpose only further reinforce its plain meaning. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotation marks omitted). So statutes and regulations must be read in context and as parts of an integrated whole. *See, e.g., United States v. Abdelshafi*, 592 F.3d 602, 608 (4th Cir. 2010). And related provisions should be interpreted "as a symmetrical and coherent regulatory scheme." *Brown & Williamson*, 529 U.S. at 133 (quotation marks omitted).

Both § 825.305(c) and § 825.307(a) address potential problems with a certification. And the cure procedure outlined in § 825.305(c) exists to "lessen[ ] the friction between employers and employees during the certification process by increasing communication and providing a clear and manageable process for resolving questions regarding certifications." 73 Fed. Reg. at 68,012. It thus makes sense that the Department would require a cure opportunity for all kinds of deficiencies. To do otherwise would risk the friction that the

Department sought to avoid.

* * *

Section 825.307(a)'s plain text—as confirmed by its history, context, and purpose—clearly establishes a required cure period for authentication issues. There is no ambiguity that would have led Hall to think that he could contact a health-care provider about an authentication deficiency before first giving Mook an opportunity to cure that deficiency. So Hall's actions violated § 825.307(a), and that violation was clear.

## Conclusion

Qualified immunity is not a defense in an FMLA action. The FMLA provides a complete remedial scheme that applies to public officials and includes a good-faith defense. And there is no history of immunity for an analogous common law tort. Even if qualified immunity was available—and thus Hall could appeal from its denial—Hall would still not prevail. The plain text of the FMLA's regulations—as confirmed by the regulations' history, context, and purpose—clearly established Mook's right to a seven-day cure period. Hall's refusal to give Mook this opportunity to cure thus violated clearly established law.

This Court should dismiss this appeal for lack of appellate jurisdiction. Alternatively, if appellate jurisdiction exists, this Court should affirm the District Court's summary-judgment denial.

## Request For Oral Argument

Mook requests oral argument, which will assist this Court in determining if Hall's arguments are within this Court's appellate jurisdiction and, if they are, to clarify the legal issues and facts in this case.

Respectfully submitted,

WILLIAM & MARY LAW SCHOOL
Appellate & Supreme Court
Clinic
PO Box 8795
Williamsburg, VA 23187

Student Counsel:
    Jonathan Gharib
    Jack Kerdasha
    Raahim Zaidi

November 13, 2025

Bryan Lammon
FINAL DECISIONS PLLC
8401 Maryland Drive Suite 8197
Richmond, VA 23294
757-204-5896
bryan@finaldecisions.org

Scott G. Crowley Sr.
CROWLEY & CROWLEY
4870 Sadler Road, Suite 300
Glen Allen, VA 23060
804-205-5010

*Attorneys for Plaintiff-Appellee Daniel Mook.*

**Certificate of Compliance**

This brief complies with the word limit in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 9,803 words, excluding the parts of the brief exempted by Rule 32(f), as counted by the word-processing software used to prepare the brief.

This brief also complies with the typeface requirements of Rule 32(a)(5) and the style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface—14-point Century Schoolbook—using Microsoft Word for Mac version 16.103.

November 13, 2025
_____
Bryan Lammon

## Certificate of Service

I certify that on November 13, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. All parties or their counsel are registered as ECF filers and will accordingly be served via the CM/ECF system.

November 13, 2025                 Bryan Lammon